GRIFFITHS and another, Respondents, vs. CRETNEY and another, imp., Appellants.

SAME, Respondents, vs. JONES, imp., Appellant.

*April 28—May 24, 1910.*

*Equity: Cancellation of instruments: Retaining jurisdiction to award damages: Exchange of property induced by fraud: Mental incapacity: Value of lands: Evidence: Joint wrongdoers: Appeal: Costs: Printing case.*

1. Where, in an action to set aside a conveyance of lands on the ground of fraud, it appeared that one of the defendants had title to the lands when plaintiffs demanded a reconveyance, but before the action was commenced had, without plaintiffs' knowl-

edge, conveyed to other persons, so that no cancellation and rescission could be awarded, it was proper for the court to retain the action and award damages for the fraud.

2. Evidence in this case tending to show, among other things, impaired mental capacity and lack of business intelligence on the part of plaintiffs and that they reposed trust and confidence in one of the defendants, who had been their adviser and who chiefly brought about the exchange of lands in question, is *held* to sustain findings that the plaintiffs relied upon false representations as to the value of wild lands taken by them in exchange for their farm and were induced thereby to make the exchange, and that they were incompetent to transact the business and did not fully comprehend it.

3. The preponderance of evidence, including conflicting opinions of witnesses, as to the value of certain wild lands is *held* to show that at the time in question they were worth $12 per acre, instead of $6 and $8 as found by the trial court.

4. It appearing that two of three defendants who had exchanged lands for plaintiffs' farm were partners dealing in real estate and had induced the third defendant to exchange his farm for an interest in that of the plaintiffs; that he put his farm into the exchange at a fair price and did not participate in or know of the false representations made by the other defendants as to wild lands which they put into the deal and in which he had no interest; and that he afterwards paid his codefendants full consideration for their interest in the plaintiffs' farm, it is *held* that such third defendant was not a joint wrongdoer with the others so as to be liable for the damages resulting from the fraud.

5. Costs are not allowed in this case for the printing of a case and briefs which violate Supreme Court Rule 6.

APPEALS from a judgment of the circuit court for Iowa county: GEORGE CLEMENTSON, Circuit Judge. *Reversed.*

Plaintiffs bring this action alleging that defendants, through misrepresentation and undue influence, fraudulently obtained an exchange of properties on September 12, 1905, and praying for cancellation of their deed of transfer of their farm to the defendants, for a reconveyance thereof to them by the defendants, and for damages in the sum of $1,000.

The plaintiffs are farmers who were born and raised on the farm of 193 acres which they acquired from their father

at his death and to which they added 168 acres. ·They were unmarried, and as partners, under the name of Griffiths Bros., farmed these 361 acres of land. For a period of years they raised blooded stock and ran a thresher, a sawmill, and a shredder. The principal business transactions of the firm were carried on by *William T. Griffiths,* the elder of the brothers. *John* at times attended to some of the smaller business dealings of the firm. In 1900 their property was worth about $30,000, consisting of the farm, worth $27,000, $14,600 in the bank, their stock, and personal property. They were then in debt in about the sum of $12,000. The defendants *Cretney* and *Collins* are partners and are in business as dealers and brokers in real estate. The defendant *Jones* is a farmer and dealer in real estate.

In 1895 or 1896 *William T. Griffiths* had an attack of nervous prostration. Morphine was administered to him to relieve him from pain, and he became addicted to its use. In 1905 he was accustomed to take five or six grains of it three times a day. After such nervous attack he was weak and infirm of body and unable to do hard work. There was evidence of the effect of morphine upon him and that he was of much less mental power than he was before his illness; that he had at times wandered from home unconscious of where he was going, unmindful of what was occurring about him; that at times he was in a dreamy state of mind; that he did not remember having paid accounts, and at one time attempted to pay an account twice. The court, who observed him at the trial and on the witness stand, at the close of the testimony, speaking of his condition, stated:

"The effect of the morphine habit upon him is manifest from observing him. The twitching of his hands, the twitching of his face, his constant motion, the closing of his eyes, has been continuously apparent while he has been in court. A casual observer would assume that he was incapable of doing anything that required intellectual effort. But upon the witness stand he has seemed quite bright, and much of his

talk has been connected, and his memory in reference to many transactions has been good. On the whole, however, his testimony has not been satisfactory, in this: he has not been able to give a lucid account of any particular transaction from beginning to end. His own testimony shows, and I do not doubt it, that when he is not under the influence of morphine he is listless and incapable of effort, and under the influence of morphine he feels much better and when interested in a subject seems bright—is bright and talks intelligently. The testimony in this case convinces me, coupled with the observation of the man, that in this business transaction now under consideration he did not have a clear comprehension of the situation."

*John Griffiths,* the other plaintiff, as above stated, had but little to do with the management of the large and important business of the firm. The evidence shows that he cared for the stock, attended to the running of the thresher, and performed manual labor connected with their business. In 1898 he lost an arm in a shredder, and on this account was thereafter less active as a worker. It is clear from the evidence that their business was managed by his brother. The court concluded as to him thus:

"I am satisfied from the testimony in this case and from my observation of the parties that *John Griffiths* is a man of hardly ordinary business intelligence—a man who has done very little of the business of the Griffiths Bros."

The plaintiff *William T. Griffiths* testified that he became intimate in a business way with the defendant *Collins* in 1903. At that time they went together to Bruce, Wisconsin, and together purchased some property. This property was afterwards sold by *Collins,* and most of the proceeds belonging to the plaintiffs were paid by *Collins* on their indebtedness. This plaintiff also testified that the plaintiffs had been partners with the defendant *Collins* in the several purchases of property and that they had not as yet received any of the profits from the sale of these properties. One transaction in land in the northern part of the state had netted $200 in com-

mission which was still wholly retained by *Collins*. Plaintiffs obtained a land contract on some lands in Canada as partners with *Collins* on the latter's recommendation, and he obtained commissions which he retains. This witness also testified that they had purchased a farm of about 200 acres in Rusk county because *Collins* recommended and advised him to do so. The defendant *Collins* denies that there ever was a partnership between him and the plaintiffs except as to the property at Bruce, Wisconsin. At the time of the exchanges of properties in question plaintiff's farm was listed with *Collins* and *Cretney* for sale.

The evidence tends to show that after 1900 the business operations of the plaintiffs were not successful, and that at the time the transactions took place between them and the defendants they had become financially embarrassed. In September, 1905, the incumbrance upon their farm had become $15,500; their money in the bank had been spent and they were in debt for some machinery; a creditor had obtained judgment for some $700 for feed furnished to them and had seized upon execution and taken from their farm blooded stock worth $3,000 or $4,000. *William T. Griffiths* had tried to borrow money to meet their obligations, but had been unsuccessful. The condition of the plaintiffs was known to the defendants.

On the morning of September 12, 1905, the plaintiff *William T. Griffiths* had gone to see the creditor who had taken some of their stock on execution to satisfy his judgment against the plaintiffs. Meanwhile the defendants had been talking with the plaintiff *John Griffiths* regarding this exchange of properties and arranged with him to meet with the plaintiff *William T. Griffiths* after dinner, at a bank in the city of Dodgeville. They so met, and late in the afternoon an agreement was reached for a transfer of properties. Plaintiffs transferred by deed their farm at the agreed price of $27,000 and were to receive an equivalent for the value

of their equity therein above the $15,500 incumbrance, in property and cash.   In exchange they were to receive a farm in Rusk county of an agreed value of $11,000, upon which there would be an incumbrance of $5,500; 160 acres of wild land in Barron county at $20 per acre; 120 acres of wild land in Rusk county at $20 per acre; the payment of $1,000 on the plaintiffs' contract for Canadian lands; $360 in cash; and a loan of money in settlement of the judgment for $700.

The plaintiffs testified that the defendants represented to them that the wild lands in Rusk and Barron counties had been acquired by them at the price of $20 per acre, and that the lands were of that value, and unless they accepted the wild lands at this price all negotiations would have to be dismissed and abandoned.   Plaintiffs also testified that it was understood that the defendant *Collins* was to go with the plaintiffs to inspect these wild lands before March 1, 1906, in order to verify his representations respecting their nature and value, and that he has failed and refused to do so.   Defendants now insist that the exchange of properties was effected and fully executed and the deeds and transfers were delivered in September, 1905, but claim that each of the parties was to pay the interest on the incumbrances on the lands transferred by them up to March 1, 1906.

The deed to the defendants was placed on record the next day.   The deed to the plaintiffs of the improved farm was sent to Rusk county to be recorded.   The judgment against the plaintiffs was satisfied.   The plaintiffs received $360 in cash, and a deed to the wild land in Rusk county was executed by the defendants *Cretney* and *Collins* in favor of the plaintiffs.   The title to the improved farm in Rusk county was owned by the defendant *Jones.*   The title to the wild lands in Rusk county was owned by the other defendants, and they also had a land contract upon the lands in Barron county.   No transfer to the plaintiffs of the lands in Barron county was executed until after March 1, 1906.   *Jones* had given full consideration to the plaintiffs for the one-half in-

terest in their farm, and the proof shows that he subsequently had paid full consideration when he secured the interests of the other defendants in the plaintiffs' old farm. He has thus transferred property to the plaintiffs or to the other defendants, or has paid money to secure this farm, amounting to about $27,000. It appears that the defendant *Jones* is very deaf, probably did not hear what was said at the bank regarding the value of the wild lands, and that he has transferred part of the farm obtained from the *Griffiths*. He testified that he had no knowledge of the value of wild lands; that he heard such lands were to be taken in the exchange at $20 per acre; that he had been up in Rusk county with *W. T. Griffiths;* and that such lands were selling at $20 per acre. The evidence introduced by the plaintiffs as to the value of the wild lands was in effect that they were worth nothing for tillage purposes, but that they had a pasturage value in connection with farm lands. Witnesses were called in plaintiffs' behalf who gave opinion evidence that the lands in Rusk county were worth at a maximum $8 per acre, and that the lands in Barron county were worth $6 per acre. On behalf of the defendants the opinion evidence was that the wild lands were worth $20 per acre.

The trial of the case was had at the March, 1907, term of the circuit court. At the conclusion of the evidence the court announced as his conclusion from the facts and the evidence adduced that it was a question whether rescission could be awarded. He therefore, at the September term of the court, made an order appointing a referee to take proof as to the rents and profits. On December 24, 1907, the court denied a motion that the scope of the inquiry before the referee should be broadened and that defendants should be allowed to take proof of the value of the wild lands. During the month of January, 1908, the referee took evidence, including evidence offered by the defendants as to the value of the wild lands.

At the June, 1908, term of the court the final decision was

announced, the court stating that the referee had improperly included in his report opinion evidence upon the value of the wild lands, but that he had read and considered it. This evidence was that these lands were worth from $12.50 to $25 per acre. The court held that rescission could not be awarded, and allowed the plaintiffs $3,660 as damages, holding that the amounts agreed upon as the value of the wild land were excessive, that the Barron county land was worth $6 per acre and the Rusk county land $8 per acre; that the plaintiffs were incompetent to transact the business and did not fully comprehend it; and that they had been induced to make the exchange of land because of the wilful misrepresentations by defendants as to the value of the wild lands. These are appeals from the judgment.

For the appellants *Cretney* and *Collins* there were briefs by *J. P. Smelker* and *Fiedler & Fiedler,* and oral argument by *Mr. Smelker.*

*Aldro Jenks,* for the appellant *Jones.*

For the respondents there were briefs by *Platt Whitman* and *James E. O'Neill,* and oral argument by *Mr. Whitman.*

SIEBECKER, J.    It is urged that the court erred in retaining jurisdiction of the cause to award plaintiffs damages after determining that a judgment for a rescission of the deeds and transfers of the lands involved could not be awarded as prayed for by the plaintiffs. The appellants' contentions embrace two questions: first, Is the case one which the court may retain if rescission could not be awarded, and grant relief by way of damages; secondly, Do the facts and circumstances shown present a case for an award of damages? As to the first question, the practice is well established that when a court of equity has obtained jurisdiction in a suit for cancellation of instruments transferring interests in lands, and it is disclosed by facts elicited on the trial that the special relief prayed for has become impracticable and that plaintiffs

are entitled only to the alternative relief of damages, the court may retain the cause to do justice between the parties. This practice was adopted and the rule applied in *Hall v. Delaplaine,* 5 Wis. 206; *Combs v. Scott,* 76 Wis. 662, 45 N. W. 532; and *Lindsay v. Fricke,* 130 Wis. 107, 109 N. W. 945.

It is undisputed that the defendant *Jones* had title to the lands at the time plaintiffs demanded a reconveyance thereof on account of the alleged fraud.   It furthermore appears that *Jones* thereafter conveyed title to 160 acres of the farm to third parties, and hence no cancellation and rescission could be awarded.   It does not, however, appear that plaintiffs knew that the defendants *Collins* and *Cretney* had conveyed their interests to the defendant *Jones* and that *Jones* had conveyed title to a portion of the land to a third person . before the commencement of this action, and therefore the court retained the cause to award plaintiffs damages to compensate them for the losses sustained through the fraud found.   The action of the court, under the circumstances of the case, was proper within the rule of the foregoing decisions.

It is contended by the defendants that the trial court erred in finding that they falsely and fraudulently misrepresented the value of the wild lands in Barron and Rusk counties, that such false and fraudulent representations were intentionally made by defendants to deceive the plaintiffs in this respect and with the object and intent to induce plaintiffs to make the exchange of properties as effected in the transaction under investigation, and that the plaintiffs relied thereon and were thereby misled to their damage in the sums found.

The evidence abundantly establishes the court's conclusion that *William T. Griffiths* was addicted to the morphine habit and that his indulgences therein had seriously affected his mind and memory and had very much impaired his capacity and ability for the transaction of business.   On this subject

the court declares that as to him, "the testimony in this case convinces me, coupled with the observation of the man, that in this business transaction now under consideration he did not have a clear comprehension of the situation." As to the brother *John* the court states: "I am satisfied from the testimony in this case and from my observation of the parties that *John Griffiths* is a man of hardly ordinary business intelligence—a man who has done very little of the business of the Griffiths Bros."

The facts disclosed on the trial tending to show that plaintiffs supposed they had made no transfer of their farm in the September, 1905, transaction, though it is undisputed they executed a deed which was recorded the next day and apparently with their consent, are cogent and persuasive as circumstances supporting the trial court in his conclusions as to plaintiffs' mental capacity and their want of ability to comprehend and understand the full import and consequences of this transaction for the disposition of their farm. It also appears that *Collins* had for a long time been their adviser in business affairs and in selling and buying land for them, and that they reposed trust and confidence in him as a promoter of their financial interest. These relations existed at the time of the exchange of properties on September 12, 1905. The acts and conduct of plaintiffs in dealing with defendants on the occasion in question, which was in the main brought about through and by *Collins,* must be considered in the light of all these existing conditions respecting plaintiffs' abilities and capacities and their friendly relations to *Mr. Collins.* A study and consideration of the evidence in support of the facts embraced in the foregoing statement leads us to the conclusion that the plaintiffs on the occasion in question relied on the statements of defendants, principally made by *Collins,* respecting the properties embraced in the exchange, the values thereof, the terms and conditions to provide for payment of the moneys coming to them thereon,

as well as the loan from them to obtain a discharge of the execution levy on their stock.   It is also manifest that their reliance on the truth of all the representations made to them concerning the properties induced them to make the exchange, and that they did not fully comprehend that the execution and delivery of the deed to their premises, under the accompanying facts and circumstances, operated as a consummation of the transfer of the properties embraced in the exchange and effectually transferred their title and interest in the former.

The appellants advance the argument that the facts and circumstances of the transaction through which the exchange was accomplished fail to show that their conduct in the matter was naturally calculated to deceive and mislead the plaintiffs.   If plaintiffs were men of ordinary intelligence and had ordinary business capacities and abilities, this claim would be well founded; but, as above stated, plaintiffs are not such men and had not the ability to deal with the defendants in an adversary character on an equal footing for protecting their rights in the transaction.   The situation was one peculiarly favorable to enable the defendants to mislead them by slightly colored false statements and thereby overreach and cheat the plaintiffs.   Reading the case from this viewpoint, we are persuaded that the evidence justifies the trial judge's conclusions to the effect that the plaintiffs relied on the statements and representations of *Collins* respecting the wild lands in Barron and Rusk counties and were thereby induced to believe they were of the value of $20 per acre, and that they accepted them as of that value in the exchange of properties.

It is urged that the trial court deprived the defendants of an opportunity to show the actual value of the wild lands, and that the court's finding of their value is against the clear preponderance of the evidence on this subject.   Complaint is made that the defendants were deprived of an opportunity to

furnish proof of the actual value of these wild lands, and
that this resulted through the error of the court in refusing
to direct the referee to take proof on this subject after the
conclusion of the trial on the issues of fraud.    It is sufficient
to say that the court's refusal to make the requested order for
the taking of evidence on this subject did not prejudice the
defendants, since the referee in fact received and reported
defendants' evidence thereon to the court, and the court con-
sidered it, as declared by him in his oral statement of his
final decision.    We shall therefore treat the evidence as re-
ceived and as before the court.    The trial court found the
Barron county wild land was of the actual value of $6 per
acre, and that in Rusk county $8 per acre, and that the
plaintiffs' farm and the Kelly farm were of the value, fixed
by the parties at the time of negotiations, of $27,000 and
$11,000, respectively.    It is urged that this value of the
plaintiffs' farm is too high by $3,600.    The opinion of wit-
nesses familiar with this land and the value of such property
sustains the value fixed by the parties and found by the court.
We do not find that this value thus found is against the clear
preponderance of the evidence, and it cannot be disturbed.

The appellants strenuously contend that the actual value
of the wild lands was not misrepresented by them and that
no fraud was perpetrated upon the plaintiffs, as they claim,
and therefore plaintiffs were not injured in the transaction.
The evidence on this subject is in irreconcilable conflict.
The witnesses called by the plaintiffs expressed their opinion
that the actual value was from four fifths to two thirds less
than the price fixed in the exchange, while the opinion of de-
fendants' witnesses placed a much higher value on them and
varied as above stated.    From the evidence adduced it is
clear that the lands had but very slight, if any, tillage value.
The witnesses whose opinions were based on such consider-
ations, if we take into account the character and availability
of these lands for agricultural purposes, tend to sustain the
court's finding, while those witnesses who exhibited famil-

iarity with land prices for trading and agricultural purposes
in these communities through their business as real-estate
brokers and agents placed values thereon which sustained de-
fendants' contentions. We are persuaded, after a painstak-
ing search into the probative force of the evidence on the
subject of the value of these lands, that the extremes of the
opinions respecting such values do not furnish a sufficiently
reliable estimate for the court to follow. We are also of the
opinion that the trial court's finding of the value of these
lands is not sustained by the clear weight of the evidence and
that the proof clearly preponderates in favor of a higher
value. This we conclude upon consideration of all the data
as to their location, kind, quality, and general nature and
availability as marketable properties under the facts shown.
Under these facts and conditions the trial court should have
found that the evidence reasonably preponderated to show
that these lands had a value of $12 an acre and that they
should be so valued in arriving at the damages sustained by
the plaintiffs through the misrepresentations on this subject.

The defendant *Jones* defends on the ground that he has in
no way participated in the alleged fraudulent representation
concerning these wild lands and was in no manner connected
with the transaction as to make him jointly liable for the
fraud found by the trial court. It appeared that the de-
fendants *Cretney* and *Collins* were partners engaged in the
real-estate business; that they solicited *Jones* to make an ex-
change of his Rusk county farm for an interest in the plaint-
iffs' farm; that he agreed to such an exchange and put his
farm into the deal at a fair value; and that he received in
return no more than its equivalent as a consideration. It
also appears that he had no interest in the wild lands and
that he did not in fact know or claim to know their value.
The evidence furthermore discloses that he made no repre-
sentation to plaintiffs of their value and heard very little, if
anything, of the misrepresentations made by *Collins* in nego-
tiating the trade. Under the circumstances there is nothing

to show that he participated or co-operated in any fraudulent conduct which induced the plaintiffs to make the exchange of properties.    The fact that the title was taken in the name of himself and *Cretney* and *Collins* is readily explicable as appropriate for subsequent adjustment of the mutual rights of the defendants.    We find nothing in the record tending to show that *Jones* participated in the fraudulent conduct of *Collins* and *Cretney* or knew that such a fraud was being perpetrated on the plaintiffs.    It is clear that he, under the circumstances, cannot be treated as a joint wrongdoer and be held liable for the damages resulting from the fraud.    As to him the action should have been dismissed.    The defendants *Collins* and *Cretney* were properly held for the resulting damages.    The amount awarded we consider to have been excessive and must be reduced accordingly.    In computing the damages the wild lands should be rated at $12 per acre instead of $6 and $8, respectively, for the Barron and Rusk county tracts as allowed by the trial court.

Supreme Court Rule 6 requires that the printed case shall contain an abridgment of the record so far as necessary to present the question for decision, and the evidence must be so abridged in narrative form.    The case and the briefs of the defendants *Collins* and *Cretney* violate this rule, and they thereby forfeit their right to recover costs for printing them.    See *Johanson v. Webster Mfg. Co.* 139 Wis. 181, 120 N. W. 832; *Skow v. G. B. & W. R. Co.* 141 Wis. 21, 123 N. W. 138; *Gerbig v. Bell, post,* p. 157, 126 N. W. 871.

*By the Court.*—The judgment is reversed, and the cause remanded with directions to enter a judgment dismissing the action as to *Thomas H. Jones,* and to award plaintiffs damages in the sum of $2,220, with interest against the defendants *A. T. Cretney* and *Joseph Collins;* no costs to be allowed appellants for the printing of the case and the printing of briefs of *Cretney* and *Collins.*